## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MARY MEIYA LIAO, Individually and on Behalf of All Others Similarly Situated,<br><br>1750 Alta Vista Place<br>Camarillo, CA 93012<br><br>           Plaintiff,<br><br>   vs.<br><br><br>JACOB J. LEW, in his official capacity as the Secretary of the Department of the Treasury,<br><br>1500 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20220,<br><br>EDWARD DeMARCO, in his official capacity as Acting Director of the Federal Housing Finance Agency,<br><br>Constitution Center<br>400 7th Street, S.W.<br>Washington, D.C. 20024,<br><br>THE DEPARTMENT OF THE TREASURY,<br><br>1500 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20220,<br><br>THE FEDERAL HOUSING FINANCE AGENCY,<br><br>Constitution Center<br>400 7th Street, S.W.<br>Washington, D.C. 20024,<br><br>           Defendants. | Civil Action No.<br><br><br><br><br>CLASS ACTION COMPLAINT |

Plaintiff Mary Meiya Liao, individually and on behalf of all others similarly situated, files this complaint against: Defendants Jacob J. Lew, in his official capacity as Secretary of the Department of the Treasury ("Treasury"); Edward DeMarco, in his official capacity as Acting Director of the Federal Housing Finance Agency ("FHFA"); the Treasury; and the FHFA. The FHFA is the conservator for the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") (collectively, the "Companies").

Defendants' actions have expropriated the rights of the preferred shareholders of the Companies without just compensation, thereby constituting an impermissible exaction and/or taking in violation of the Fifth Amendment of the United States Constitution. Plaintiff also seeks to prevent Defendants from giving effect to, or enforcing, the Third Amendment to preferred stock purchase agreements ("PSPAs") executed by the Treasury and the FHFA, acting as conservator for the Companies. The Third Amendment fundamentally alters the structure and nature of the securities the Treasury purchased under the PSPAs, impermissibly destroys value in all of the Companies' privately held securities, and illegally begins to liquidate the Companies.

## NATURE OF THE ACTION

1.      This is a class action on behalf of all persons and/or entities who purchased or acquired Fannie Mae or Freddie Mac preferred stock. As alleged herein, Defendants' actions have expropriated the rights of the preferred shareholders of the Companies without just compensation, thereby constituting an impermissible taking in violation of the Fifth Amendment. This action is also brought under the Administrative Procedure Act, 5 U.S.C. §§551-559, 701-706 ("APA"), and the Housing and Economic Recovery Act of 2008, 12 U.S.C. §§1455, 1719, 4617 ("HERA"), challenging the action of the Treasury and the FHFA to materially amend the PSPAs according to which the Treasury purchased a new class of preferred stock in the

Companies (the "Government Preferred Stock"), and to materially amend the stock certificates that created the Government Preferred Stock. The challenged amendments to the PSPAs and stock certificates – which the Treasury and the FHFA executed on August 17, 2012 – are set forth within the Third Amendment.

2.      During the mortgage-related financial crisis that began in 2007, Congress created the FHFA to oversee the operations of Fannie Mae and Freddie Mac. Congress also empowered the FHFA to serve as conservator to the Companies when necessary to preserve their financial condition. The FHFA was obligated to manage the Companies with the goal of placing them in a sound and solvent financial condition while preserving and conserving their assets.

3.      Additionally, Congress authorized the Treasury to provide limited financial assistance to the Companies. The Treasury was authorized to provide this assistance by purchasing securities issued by the Companies if it determined that such purchases would help stabilize financial markets, prevent disruptions in the mortgage markets, and protect taxpayers.

4.      On September 7, 2008, the Director of the FHFA placed Fannie Mae and Freddie Mac into conservatorship, committing to operate the Companies until they were stabilized. Shortly thereafter, the Treasury and the FHFA executed the Third Amendment to preferred stock purchase agreements ("PSPAs"). Pursuant to the PSPAs, the Treasury purchased one million shares of the Government Preferred Stock from each company in exchange for a funding commitment that allowed each company to draw up to $100 billion from the Treasury as needed to ensure that they maintained a net worth of at least zero.

5.      The Government Preferred Stock for each company has a liquidation preference equal to $1 billion plus the sum of all draws by each company against the Treasury's funding commitment, and is entitled to a cumulative dividend equal to ten percent of the outstanding

liquidation preference.  The PSPAs also granted the Treasury warrants to purchase up to 79.9% of each company's common stock at a nominal price.

6.      Shortly after the commencement of the conservatorship, the Companies declared large non-cash losses, including write-downs of the value of significant tax assets – known as deferred tax assets – and large loss reserves, on their balance sheets.  These accounting adjustments reflected pessimistic views about the Companies' future financial condition and temporarily decreased the Companies' operating capital and their net worth by hundreds of billions of dollars.  The Treasury began purchasing Government Preferred Stock in 2008 in large part to shore the holes in the Companies' balance sheets created by these accounting reserves.

7.      By 2012, however, the Companies' financial condition recovered to the point that they were achieving profitability and their actual condition was never as bad as had been originally feared.  Among other things, between 2008 and 2012, the Companies' actual realized loan losses were approximately $100 billion less than their anticipated losses.

8.      Because of their improved financial condition, the Companies have been able to reverse the write-downs of their deferred tax assets and loss reserves that impaired their balance sheets for years, and their true financial strength was revealed.  For example, the Companies posted sizable profits in the first two quarters of 2012, and announced that they expected to be profitable into the future.  The prospect that the Companies could both redeem the Government Preferred Stock and provide value to holders of the Companies' other preferred stock (including the Treasury) was – or should have been – obvious to both the Treasury and the FHFA.  Indeed, the stream of profits projected to continue in the coming years meant that the Companies' net worth was poised to increase by several hundred billion dollars.

9.      By the end of 2012, Fannie Mae's profitability was such that it could not avoid writing-up its deferred tax assets.  Under Generally Accepted Accounting Principles ("GAAP") and Securities and Exchange Commission ("SEC") rules, Fannie Mae's management was required to recognize that its expected continued profitability meant that it was going to be able to use its deferred tax assets.  Notably, the original write-down of those assets is what caused the Treasury to inject surplus funds into Fannie Mae, and under the Third Amendment, the write-up of those same assets has resulted in an enormous infusion of cash to the Treasury.

10.      Instead of exercising its right to purchase up to 79.9% of the Companies' common stock – or taking steps to enable the Companies to redeem the Government Preferred Stock – the FHFA and the Treasury maneuvered to ensure that the Treasury would be the sole beneficiary of the Companies' improved financial position.  Through the Third Amendment, the FHFA and the Treasury fundamentally altered the dividend structure of the Government Preferred Stock. Under the original stock certificates, the Treasury's dividend was paid quarterly in the amount equal to an annual 10% of the Government Preferred Stock's outstanding liquidation preference. In the Third Amendment, however, the FHFA and the Treasury amended the dividend provision to require that every dollar of each company's net worth above a certain capital reserve amount be given to the Treasury as a dividend.  The specified capital reserve amount steadily declines to zero in 2018.  The Third Amendment also requires that the Companies liquidate their portfolio of mortgages faster than required under the original PSPAs.

11.      The Treasury's additional profits from the Third Amendment are enormous.  On or about June 30, 2013, Fannie Mae and Freddie Mac collectively paid the Treasury the largest dividend in history: $66.3 billion.  By contrast, without the Third Amendment, the Treasury would have received $4.7 billion.

12.     At the time of the Third Amendment, the liquidation preference for the Government Preferred Stock was approximately $189 billion, with approximately $117 billion attributable to Fannie Mae and $72 billion attributable to Freddie Mac.  According to the Companies' financial statements, at the time of the Third Amendment, they had each paid dividends to the Treasury equal to approximately 28% of the liquidation preference of their respective outstanding Government Preferred Stock (more than $25 billion by Fannie Mae and more than $20 billion by Freddie Mac).

13.     The Companies' continued profitability has accelerated their payments to the Treasury under the Third Amendment.  Indeed, Fannie Mae recently announced that it would write-up a portion of its deferred tax assets in the second quarter of 2013.  As a result, Fannie Mae projected that by the end of the second quarter of 2013, it would have paid $95 billion in dividends to the Treasury, almost 81% of the Government Preferred Stock's liquidation preference.  Although Freddie Mac has not yet announced a similar write-up of its deferred tax assets, it stated that by the end of the second quarter of 2013, it would have paid $36.5 billion in dividends to the Treasury – or approximately 51% of the liquidation preference of the Government Preferred Stock it sold to the Treasury.  When Freddie Mac eventually does write-up its deferred tax assets, the Third Amendment will require it to transfer an additional $30 billion to the Treasury.  Under current projections, in fact, the Companies will have fully reimbursed the Treasury with interest by next year.

14.     Under the Third Amendment, however, the amount of cash the Companies transfer to the Treasury as a dividend does not reduce the amount of the Government Preferred Stock outstanding.  Thus, regardless of how much money the Companies send to the Treasury, all of the Government Preferred Stock will remain outstanding, and the Treasury will continue to

take substantially all of the Companies' net worth as long as they remain in business.  Indeed, the President's proposed Fiscal Year 2014 budget estimated that by the end of the next 10 years, the Treasury will have collected more than $238 billion from the Companies, approximately $50 billion more than it cost the Treasury to purchase the Government Preferred Stock.   The Congressional Budget Office's May 2013 report, "Updated Budget Projections: Fiscal Years 2013 to 2023," moreover, shows that "certain accounting changes" are expected to add $95 billion in receipts to the Treasury in 2013.

15.     Accordingly, the Third Amendment enriches the federal government through a self-dealing agreement, and destroys tens of billions of value in the Companies' preferred stock that is, as a result of the PSPAs, now junior to the Government Preferred Stock (the "Private Sector Preferred Stock").  Fannie Mae and Freddie Mac sold the Private Sector Preferred Stock to private investors before it sold the Government Preferred Stock to the Treasury.

16.     The Third Amendment therefore drains all cash and other net worth from the Companies, leaving no funds to pay dividends on the Companies' Private Sector Preferred Stock, or to satisfy the Private Sector Preferred Stock's liquidation preference.  The Third Amendment thus deprives the Companies' Private Sector Preferred Stock of substantial present and future value.  Indeed, after Fannie Mae and Freddie Mac transfer their net worth to the Treasury, there will be no remaining funds to pay dividends to holders of these securities.  As the FHFA recently acknowledged, moreover, the Third Amendment also deprives the Companies of funds to rebuild their capital reserves.

17.     The Treasury has explicitly stated that a primary purpose of the Third Amendment is to expedite the wind down of Fannie Mae and Freddie Mac as going concerns. The Treasury explained that as a result of the Third Amendment, the Companies will be wound

down and will not be allowed to retain profits, rebuild capital, or return to the market in their prior form. Thus, upon liquidation, the Companies will have no remaining funds after paying their creditors and the Treasury as the holder of the Government Preferred Stock to satisfy the Private Sector Preferred Stocks' liquidation preference. This fact is true no matter how much money the Companies pay to the Treasury, or how much that sum exceeds the Treasury's commitment to the Companies. Accordingly, as the FHFA's inspector general recently observed, the PSPAs mean that preferred shareholders of the Companies effectively lost their investments.

18. Neither the Treasury nor the FHFA, moreover, had authority to enter into the Third Amendment. Indeed, the Treasury's temporary statutory authority to purchase securities issued by Fannie Mae and Freddie Mac expired at the end of 2009. The FHFA, as conservator of Fannie Mae and Freddie Mac, was statutorily required to operate the Companies so as to render them sound and solvent and to conserve their assets and property.

19. The Treasury also acted arbitrarily and capriciously in entering into the Third Amendment. Even when the Treasury had authority to purchase the Companies' securities, it could not exercise its authority unless it made statutorily-required determinations upon consideration of statutorily-defined criteria. The Treasury, however, did not make a public record reflecting the required determinations or its consideration of the required factors before executing the Third Amendment.

20. Additionally, the Companies' financial positions at the time of the Third Amendment were such that the Third Amendment was not consistent with the Treasury having considered the required factors or having made the necessary determinations in any reasoned manner. In fact, reports prepared for each company by the FHFA and delivered to the Treasury

before and immediately after the Third Amendment show that they did not need further funds from the Treasury and were, in fact, capable of repaying the Treasury. The Treasury also failed to consider whether the Third Amendment was consistent with the duties it owes as the Companies' dominant shareholder to holders of the Companies' Private Sector Preferred Stock.

21.     The FHFA also acted arbitrarily and capriciously in agreeing to the Third Amendment. The FHFA did not make any attempt to reconcile the Third Amendment – an explicitly acknowledged step towards liquidating Fannie Mae and Freddie Mac – with its obligation to preserve and protect the Companies' assets. In fact, the FHFA now acknowledges that the Third Amendment prohibits the Companies from building capital, which is inherently inconsistent with the FHFA's statutory duties as conservator. Indeed, the Companies' financial positions at the time of the Third Amendment were such that liquidating them could not be consistent with preserving and protecting the Companies' assets. The FHFA also failed to consider whether the Third Amendment was consistent with duties it owes to holders of the Companies' Private Sector Preferred Stock.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction pursuant to 28 U.S.C. §1343(a)(3). This action also arises under the APA, 5 U.S.C. §§551-559, 701-706, and HERA, 12 U.S.C. §§1455, 1719, 4617. Thus, the Court also has subject-matter jurisdiction over this action under 28 U.S.C. §1331. The Court is authorized to issue the non-monetary relief sought herein pursuant to 5 U.S.C. §§702, 705, and 706.

23.     Venue is proper in this Court under 28 U.S.C. §1391(e)(1)(A) and (B). This is an action against officers and agencies of the United States, and Defendants all reside in this judicial district; Secretary Lew and Acting Director DeMarco both perform their official duties in this

judicial district; and a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## PARTIES

24.     Plaintiff Mary Meiya Liao owns shares of Fannie Mae preferred series stock. Plaintiff has owned stock in Fannie Mae since long before the Third Amendment, and purchased this stock in reliance on the terms of the Government Preferred Stock as it existed before the Third Amendment.  The Private Sector Preferred Stock has two principal features: (1) it entitles Plaintiff to a contractually specified, non-cumulative dividend from Fannie Mae to the extent a dividend is declared for preferred stock of less than or equal seniority; and (2) it entitles Plaintiff to a priority claim to a contractually specified liquidation preference should Fannie Mae liquidate.  These entitlements are junior to the Treasury's lawful rights under the PSPAs. Subject to a capital reserve requirement that is steadily phased out by 2018, the Third Amendment to the PSPAs sweeps all of Fannie Mae's and Freddie Mac's net worth to the Treasury on a quarterly basis.  By depriving the Companies of substantially every dollar of net worth, the Third Amendment prevents them from ever paying dividends on the Private Sector Preferred Stock.  As a result, the Third Amendment strips the Companies' Private Sector Preferred Stock of substantially all value.

25.     Defendant Jacob J. Lew ("Lew") is the Secretary of the Department of the Treasury.  Defendant Lew's official address is 1500 Pennsylvania Avenue, N.W., Washington, D.C. 20220, and Plaintiff sues Defendant Lew in his official capacity.  In that capacity, Defendant Lew has overall responsibility for the Treasury's management and operation. Defendant Lew, in his official capacity, is responsible for the Treasury's conduct that is the subject of this complaint and for the related acts and omissions alleged herein.

26.     Defendant Edward DeMarco ("DeMarco") is the Acting Director of the FHFA. Defendant DeMarco's official address is Constitution Center, 400 7th Street, S.W., Washington, D.C. 20024, and Plaintiff sues Defendant DeMarco in his official capacity.  In that capacity, Defendant DeMarco has overall responsibility for the operation and management of the FHFA. Defendant DeMarco, in his official capacity, is responsible for the conduct of the FHFA that is the subject of this complaint and for the related acts and omissions alleged herein.

27.     Defendant Department of the Treasury ("Treasury") is, and was at all times relevant hereto, an agency of the United States government subject to the APA.  The Department is located at 1500 Pennsylvania Avenue, N.W., Washington, D.C. 20220.

28.     Defendant Federal Housing Finance Agency ("FHFA") is, and was at all relevant times, an agency of the United States government subject to the APA.  The FHFA is located at Constitution Center, 400 7th Street, S.W., Washington, D.C. 20024.

## SUBSTANTIVE ALLEGATIONS

29.     Fannie Mae and Freddie Mac are the country's two largest mortgage companies, together holding or guaranteeing trillions of dollars in debt.  During the Great Depression, as borrowers defaulted on mortgages and banks found themselves strapped for cash, President Franklin D. Roosevelt and Congress created Fannie Mae in 1938, in order to buy mortgages from lenders, freeing up capital that could go to other borrowers.  Although Fannie Mae began with just $1 billion in purchasing power, the agency helped usher in a new generation of American home ownership, paving the way for banks to loan money to low- and middle-income buyers who otherwise might not have been considered creditworthy.  Fannie Mae grew so large over the years that in 1968, with the pressures of the Vietnam War straining the national budget, President Lyndon Johnson took Fannie Mae's debt portfolio off the government balance sheet.  Thus,

Fannie Mae was converted into a publicly traded company owned by investors.  Two years later, Freddie Mac was launched, primarily to keep Fannie Mae from functioning as a monopoly. Freddie Mac went public in 1989.

30.    Fannie Mae is a federally chartered private stockholder-owned corporation organized and existing under the Federal National Mortgage Act, created to provide supplemental liquidity to the mortgage market.  Freddie Mac is a federally chartered private stockholder-owned corporation organized and existing under the Federal Home Loan Corporation Act, created to stabilize the nation's residential mortgage market and expand opportunities for homeownership and affordable rental housing.  Both Fannie Mae and Freddie Mac are Government-Sponsored Enterprises, private corporations created by Congress with the goal of increasing liquidity in the mortgage market.  The Companies endeavor to fulfill their goals by, among other things, purchasing mortgages originated by private banks and bundling the mortgages into mortgage-related securities that can be sold to investors.  By creating this secondary mortgage market, Fannie Mae and Freddie Mac increase liquidity for private banks, allowing them to make additional loans to individuals to purchase homes.

31.    As of 2007, Fannie Mae and Freddie Mac were owned by private shareholders. Before 2007, the Companies were consistently profitable. In fact, Fannie Mae had not reported a full-year loss since 1985, and Freddie Mac had not reported a loss since 1989.  In 2007, however, the nation's mortgage market began a precipitous decline as a faltering economy led to an increasing number of delinquent and defaulted mortgages.  This decline had a particularly severe effect on the market's confidence in the financial health of Fannie Mae and Freddie Mac.

32.    At the time, numerous government officials sought to allay these concerns and affirm the continued financial strength of the Companies.  James B. Lockhart, then Director of

the Office of Federal Housing Enterprise Oversight ("OFHEO") and later Director of the FHFA, said that the Companies were "adequately capitalized, holding capital well in excess of [regulatory requirements]" and had "large liquidity portfolios, access to the debt market and over $1.5 trillion in unpledged assets."

33.     Nevertheless, given the importance of housing to the U.S. economy and the need to provide confidence to the market, Congress intervened by passing HERA.  HERA created the FHFA, which took over regulatory responsibility for the Companies from OFHEO.  HERA authorized the FHFA to place the Companies in conservatorship or receivership under certain statutorily defined circumstances.

34.     Soon after the enactment of HERA, the FHFA placed the Companies into conservatorship.  As the conservator for Fannie Mae and Freddie Mac, the FHFA became responsible for preserving and conserving their assets and property and managing them so as to restore them to a sound and solvent condition.  Additionally, the FHFA committed to operate the Companies until they were stabilized.  Acting Director DeMarco confirmed this operating framework, stating that the statutory purpose of conservatorship was to preserve and conserve each company's assets and put them in a sound and solvent condition, to help restore confidence in the Companies, enhance their capacity to fulfill their mission, and to mitigate the systemic risk that contributed directly to instability in the financial markets.

35.     Additionally, HERA authorized the Treasury to strengthen the Companies' balance sheets by purchasing their securities, within set time limits and consistent with certain statutory requirements.  From the enactment of HERA in 2008 through the end of 2009, Congress authorized the Treasury to purchase any obligations and other securities issued by the Companies on such terms and conditions as the Secretary may determine and in such amounts as

the Secretary may determine.  In order to exercise that authority, HERA required the Secretary to determine that purchasing the Companies' securities was necessary to provide stability to the financial markets, prevent disruptions in the availability of mortgage finance, and protect the taxpayer.

36.     In making those determinations, the Secretary was required to consider several factors: (1) the need for preference or priorities regarding payments to the Government; (2) limits on maturity or disposition of obligations or securities to be purchased; (3) the Companies' plans for the orderly resumption of private market funding or capital market access; (4) the probability of the Companies fulfilling the terms of any such obligation or other security, including repayment; (5) the need to maintain the Companies' status as private shareholder-owned companies; and (6) restrictions on the use of the Companies' resources, including limitations on the payment of dividends and executive compensation or any such other terms and conditions as appropriate for those purposes.

37.     The Treasury entered into the PSPAs with the FHFA, which acted on behalf of both Companies.  The PSPAs are identical in all material respects.  Under the PSPAs, the Treasury purchased one million shares of Government Preferred Stock from each of the Companies in exchange for allowing them to draw up to $100 billion each from the Treasury. The Government Preferred Stock has a liquidation preference equal to $1 billion plus the sum of all draws by each company against the Treasury's funding commitment, and is entitled to a cumulative dividend equal to ten percent of the outstanding liquidation preference.

38.     If the Companies pay a dividend, the PSPAs require payment in full to the Treasury of dividends declared, but not paid, for prior dividend periods, before any privately held securities may receive a dividend.  Indeed, the PSPAs explicitly prohibit the payment of any

dividend to any shareholder other than the Treasury without the Treasury's consent.  Further, if the Companies liquidate, the Treasury must recover the full liquidation value of its shares before any other shareholder may recover anything.  The PSPAs also grants the Treasury warrants to purchase up to 79.9% of the Companies' common stock at a nominal price.

39.     At the end of 2009, however, the Treasury's statutory authority to purchase the Companies' securities expired.  To enable the Treasury to provide liquidity to the Companies beyond 2009, the Treasury and the FHFA amended the PSPAs twice before the end of 2009.  First, in May 2009, the Treasury agreed to expand its funding commitment from $100 billion per company to $200 billion per company.  Then, on December 24, 2009, just before its temporary authority under HERA expired, the Treasury agreed to a funding commitment that would be sufficient to enable the Companies to satisfy their capitalization requirements for 2010, 2011, and 2012, and to a funding commitment in subsequent years up to a limit determined by an agreed-upon formula.

40.     As a result of the PSPAs, both Companies have issued several series of Private Sector Preferred Stock that are subordinate to the Government Preferred Stock.  This stock, which was sold prior to the issuance of the Government Preferred Stock, is held by private investors.  As of March 31, 2013, the Companies' outstanding Private Sector Preferred Stock had an aggregate liquidation preference of $33 billion.  The Companies' current outstanding Private Sector Preferred Stock amounts to more than $105 billion.  Each class of Private Sector Preferred Stock has its own contractual dividend rate and liquidation value.

41.     The Treasury and other federal agencies encouraged private investors to purchase Private Sector Preferred Stock before the FHFA placed the Companies into conservatorship.  In fact, before the conservatorship, banking regulators believed that investments in the Companies

were extraordinarily safe.  When the Companies entered conservatorship, the FHFA suspended the payment of dividends on all of the Private Sector Preferred Stock and the PSPAs explicitly prohibit the payment of any such dividends without Treasury's consent.  Thus, holders of the Companies' Private Sector Preferred Stock have not received any dividends on their investment since 2008.

42.    The Companies incurred substantial impairments to their balance sheets once in conservatorship.  The Companies, under the direction of the FHFA, expected to incur substantial loan losses in the coming years and did not expect to be profitable.  Thus, the Companies booked substantial reserves – recorded loan losses before actually incurring them – and under applicable accounting standards, eliminated the value of non-cash deferred tax assets from their balance sheets.  These impairments set off a harmful feedback loop that required the Companies to draw increasing amounts against the Treasury's funding commitment.

43.    The Companies had less capital and therefore needed capital from the Treasury to operate because of these accounting adjustments.  Because of their depleted operating capital, moreover, the Companies also sometimes lacked the funds necessary to pay the Treasury the quarterly dividends due under the PSPAs.  This fact required the Companies to draw additional funds from the Treasury's funding commitment in order to pay the dividends.  All of these draws increased the amount of the Treasury's aggregate liquidation preference, and thus the amount of dividends payable to the Treasury.  Under the PSPAs, as amended, the Treasury infused approximately $187 billion into the Companies and received approximately $55 billion in return in the form of dividends and other fees between 2008 and 2012.  During this timeframe, the FHFA continued to manage the Companies in conservatorship.  HERA empowered the FHFA to

force the Companies into receivership and to liquidate their assets under certain circumstances, but the FHFA apparently never considered that as a viable option.

44.     By the first and second quarters of 2012, it became clear that the Companies' financial position was not as bad as had been feared.  Among other things, their actual loan losses were far less than their anticipated losses.  For example, between the beginning of 2007 and the second quarter of 2012, the Companies had placed more than $234 billion in reserve to absorb anticipated loan losses.  But over that same time period, the Companies had realized loan losses of just over $125 billion. In other words, the Companies had overstated their projected loan losses by $109 billion which was artificially weighing down their net worth.  Additionally, in the first two quarters of 2012, the Companies posted sizable profits totaling more than $10 billion.  The Companies' 10-Qs disclosed that they expected to be consistently profitable for the foreseeable future.  These projected future profits meant that the Companies would be able to remove the valuation allowance against their deferred tax assets, worth approximately $100 billion, in future years.  Together, these profits and facts regarding the Companies' balance sheets showed that the Companies could both position themselves to redeem the Government Preferred Stock and provide a financial return to holders of their Private Sector Preferred Stock.

45.     The fact that the Companies were returning to financial health and would soon be able to position themselves to redeem the Government Preferred Stock was – or at least should have been – obvious to the Treasury and the FHFA.  But instead of taking steps to aid that process, the Treasury and the FHFA entered into the Third Amendment, which ensured that Treasury would be the only beneficiary of the Companies' profitability and that the Companies would be wound down.  Under the Third Amendment, rather than paying the Treasury a ten percent dividend, the Companies are required to pay every dollar of their quarterly net worth

16

(above a nominal capital reserve amount that steadily declines until it is eliminated in 2018) to the Treasury as a dividend.  In Treasury's words, under the Third Amendment, it is owed a full sweep of "every dollar of profit that each firm earns going forward."

46.     The dividends that will be paid under the Third Amendment are expected to result in an enormous amount of cash to Treasury.  In 2012, the Companies made combined profits of more than \$28 billion.   In the first quarter of 2013, they posted combined profits of approximately \$15 billion.   Because of its profitability, Fannie Mae was able to add approximately \$51 billion to its net worth by recapturing some of the deferred tax assets it had written off in prior years.   Freddie Mac is expected to recognize deferred tax assets worth approximately \$30 billion in the near future, possibly as soon as this quarter.   In fact, at the end of the second quarter of 2013, the Companies collectively paid \$66.3 billion under the Third Amendment.  Such large payments were not unexpected; shortly after the execution of the Third Amendment, the FHFA's Inspector General recognized that the new arrangement could result in "an extraordinary payment to Treasury."   Indeed, the Treasury expects to recoup every dollar of the \$187 billion it infused into the Companies within the next year: over the next ten years, the Treasury expects to collect \$50 billion more from the Companies than it advanced to them.

47.     The dividend under the Government Preferred Stock must be paid to the Treasury in cash, even though the net worth of the Companies may include non-cash assets, such as the deferred tax assets.  As a result, the Companies have had to sell non-liquid assets or issue debt to pay the dividend, which has had the foreseeable effect of preventing them from maximizing the value of their assets.   Further, the Companies can never accumulate capital under the Third Amendment and can never redeem the Government Preferred Stock.  Accordingly, so long as the Companies remain in operation, all of their net worth will be transferred to the Treasury but the

outstanding balance of the Government Preferred Stock will remain $189 billion.   Under the Third Amendment, none of the Companies' assets can be used to provide value to holders of their Private Sector Preferred Stock.

48.     The Treasury announced the Third Amendment on August 17, 2012, less than two weeks after the Companies announced their substantial profits for the second quarter of that year. The Treasury's primary justification for the Third Amendment was that it would help expedite the wind down of Fannie Mae and Freddie Mac, make sure that every dollar of earnings each firm generates is used to benefit taxpayers, and support the continued flow of mortgage credit during a responsible transition to a reformed housing finance market.   The FHFA stated, however, that the Third Amendment was part of the process of both building for the future and gradually contracting the Companies' operations.

49.     Neither the Treasury nor the FHFA made any public record of their decision-making processes in agreeing to the Third Amendment.   Thus, there is no public record that the Treasury made the determinations or considered the factors required by HERA before executing the Third Amendment.   In any event, the Treasury's description of the Third Amendment as assisting an expedited winding down of the Companies' operations demonstrates that the Third Amendment is wholly inconsistent with consideration of required statutory factors, such as the need to maintain the Companies' status as private shareholder-owned companies and the Companies' plans for the orderly resumption of private market funding or capital market access. There is also no evidence that the Treasury considered alternatives to the Third Amendment that would have been both consistent with its statutory obligations and less harmful to holders of the Companies' Private Sector Preferred Stock, including refinancing the Government Preferred

Stock or allowing the Companies to resume paying dividends to holders of their Private Sector Stock.

50.     Additionally, there is no public record that the FHFA considered whether the Third Amendment is consistent with its statutory obligations as the Companies' conservator. The Treasury's stated purpose of winding down the Companies, which necessarily involves dissipating their assets and property, is incompatible on its face with FHFA's charge to put the Companies back into a sound and solvent condition and to conserve their assets and property. Acting Director DeMarco's statement that the Third Amendment reflects the FHFA's goal of gradually contracting the Companies' operations is also inconsistent with that obligation.

51.     There is no evidence, moreover, that the FHFA considered alternatives to the Third Amendment that would have been both consistent with its statutory obligations and less harmful to holders of the Companies' Private Sector Preferred Stock, including refinancing the Government Preferred Stock or allowing the Companies to resume paying dividends to holders of their Private Sector Stock.  Moreover, there is no public record that either government agency – the Treasury or the FHFA – considered whether the Third Amendment is consistent with their duties to holders of the Companies' Private Sector Preferred Stock.

## CLASS ACTION ALLEGATIONS

52.     Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all those who purchased the Companies' preferred stock and who were damaged thereby.  Excluded from the Class are Defendants and their families, the officers and directors of the Companies, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have, or had, a controlling interest.

53.     The members of the Class are so numerous that joinder of all members is impracticable.  Through the times relevant herein, the Companies' preferred stock was actively traded.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Companies or their transfer agents, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in class actions.

54.     Plaintiff's claims are typical of the claims of the members of the Class, since all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law alleged herein.

55.     Plaintiff will fairly and adequately protect the interests of the members of the Class, and has retained counsel competent and experienced in class action litigation.

56.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants' acts constituted violations of the laws; and

(b)     to what extent the members of the Class have sustained damages and the proper measure of damages.

57.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them.  Additionally, there will be no difficulty in the management of this action as a class action.

## CLAIMS FOR RELIEF

### COUNT I
**Illegal Taking and/or Exaction in Violation of the United States Constitution**

58.     Plaintiff incorporates by reference the allegations of the preceding paragraphs.

59.     Through the conduct alleged herein, Defendant destroyed the rights and value of the property interests associated with the preferred stock of the Companies held by Plaintiff and the Class, without just compensation, and nullified Plaintiff's reasonable, investment-backed expectations, and violated the fundamental principles of the Due Process and Takings Clauses of the United States Constitution.

60.     Defendants violated the statutory, contractual, and Constitutional rights of Plaintiff and the Class in taking private property as alleged herein without providing just compensation.  Defendants took and/or exacted the property and property rights of the Companies' shareholders by, among other things: (1) improperly taking all of the net worth of the Companies; and (2) by improperly imposing the stock agreements and conservatorships over the Companies.

61.     Defendants failed to pay just compensation to Plaintiff and members of the Class. As a direct result, Plaintiff and the Class suffered monetary damage.

### COUNT II
**Violation of the Administrative Procedure Act:**
**The Treasury's Conduct Exceeds Its Statutory Authority**
**Under The Housing and Economic Recovery Act**

62.     Plaintiff incorporates by reference the allegations of the preceding paragraphs.

63.     The APA empowers the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations" or that are "without observance of procedure required by law." 5 U.S.C. §706(2)(C), (D).

64.     HERA limits the Treasury's authority to make financial investments in the Companies. For example, the Treasury's authority under HERA to purchase the Companies' securities and to modify the terms and conditions of those securities expired on December 31, 2009. 12 U.S.C. §§1455(*l*)(4), 1719(g)(4).

65.     The Third Amendment, which was executed on August 17, 2012, created new securities, and the Treasury's purchase of those securities violated that clearly demarcated limit on its authority.

66.     Under the original PSPAs, the Treasury purchased equity interests that entitled it to Government Preferred Stock with certain characteristics: a liquidation preference equal to the Companies' draws against the Treasury's funding commitment and an annual dividend worth ten percent of the aggregate liquidation preference. These interests were embodied by stock certificates issued by the Companies. The PSPAs also grant the Treasury warrants to purchase up to 79.9% of the Companies' common stock at a nominal price. The Third Amendment altered the underlying stock certificates to create a new security that entitles the Treasury to a complete sweep of all of the Companies' net worth every quarter for as long as they remain in operation and that extinguishes all other equity rights.

67.     The Third Amendment thus effected a wholesale change to the nature of the Treasury's securities after its authority to purchase new securities expired. Notably, the Treasury could have exercised its warrants to purchase 79.9% of the Companies' common stock under the existing terms of the PSPAs. Doing so would have enabled both the Treasury and private

investors to share in the Companies' financial gains; instead, the Treasury executed the Third Amendment, creating a new equity interest that seizes all of the Companies' gains for itself.

68.     The Treasury also exceeded its authority by amending the PSPAs without making certain statutorily required findings or considering statutorily required factors. Before exercising its temporary authority to purchase securities, HERA requires the Treasury to "determine that such actions are necessary to . . . (i) provide stability to the financial markets; (ii) prevent disruptions in the availability of mortgage finance; and (iii) protect the taxpayer." 12 U.S.C. §1719(g)(1)(B). In making the statutorily required determinations, HERA requires the Treasury to consider such factors as "the [Companies'] plan[s] for the orderly resumption of private market funding or capital market access" and "the need to maintain the [Companies'] status as . . . private shareholder-owned compan[ies]," among other factors. 12 U.S.C. §1719(g)(1)(C).

69.     These statutory criteria apply to amendments of the PSPAs, in addition to the original execution of those agreements. Otherwise, the Treasury could fundamentally alter its investments in the Companies at any time, including after its investment authority has expired, without making the required determinations or considering the necessary factors. This would turn HERA's grant of temporary authority to the Treasury to purchase the Companies' securities under certain conditions into an unconstrained, permanent authority.

70.     As far as the public record discloses, the Treasury has not made any of the required determinations or considered any of the necessary factors. It therefore exceeded its statutory authority.

71.     In any event, the Third Amendment is not compatible with due consideration of the factors the Treasury must consider before purchasing the Companies' securities or amending its agreements to purchase such securities. The Third Amendment destroys value in all privately

held securities, demonstrating that it is wholly incompatible with "the need to maintain the [Companies'] status as . . . private shareholder-owned compan[ies]" and with the "orderly resumption of private market funding or capital market access."

72.     The Treasury's conduct in entering into the Third Amendment was therefore "in excess of statutory . . . authority" and "without observance of procedure required by law," and Plaintiff is therefore entitled to relief against the Treasury pursuant to 5 U.S.C. §§702, 706(2)(C), (D).

### COUNT III
### Violation of the Administrative Procedure Act:
### The Treasury's Conduct Was Arbitrary and Capricious

73.     Plaintiff incorporates by reference the allegations of the preceding paragraphs.

74.     The APA empowers the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A). This means, among other things, that agency action is unlawful unless it is the product of reasoned decision-making. Decision-making that relies on inadequate evidence or that results in inconsistent or contradictory conclusions cannot satisfy that standard.

75.     Before the Treasury exercises its temporary authority to purchase the Companies' securities, HERA requires the Treasury to determine that the financial support is necessary to "provide stability to the financial markets," "prevent disruptions in the availability of mortgage finance," and "protect the taxpayer."  12 U.S.C. §§1455(*l*)(1)(B)(i)-(iii), 1719(g)(1)(B)(i)-(iii). In making these determinations, HERA further requires the Treasury to "take into consideration" several factors, including the "plan for the orderly resumption of private market funding or

capital market access," and the "need to maintain [the] status [of Fannie and Freddie] as . . . private shareholder-owned compan[ies]." *Id.* §§1455(*l*)(1)(C)(iii), (v), 1719(g)(1)(c)(iii), (v).

76.     These statutory criteria apply to all amendments of the PSPAs. Otherwise, the Treasury could fundamentally alter its investments in the Companies at any time, including after its investment authority has expired, without making the required determinations or considering the necessary factors. This would turn HERA's grant of limited, temporary authority to the Treasury, to purchase the Companies' securities under certain conditions, into an unconstrained and permanent authority.

77.     There is no public record that the Treasury made the required determinations or considered the necessary factors before agreeing to the Third Amendment. Thus, the Treasury has failed to explain how its conduct is consistent with its statutory obligations. Indeed, the available evidence reveals that it was not. Further, the Treasury also has not explained whether it considered alternatives to the Third Amendment that would have been both consistent with its statutory obligations and less harmful to private investors in the Companies, including refinancing the Government Preferred Stock or allowing the Companies to resume paying dividends to holders of their Private Sector Stock.  The Treasury has thus arbitrarily and capriciously failed to provide a reasoned explanation for its conduct, which results in the government's appropriation of tens of billions in private shareholder value.

78.     The Treasury also acted in an arbitrary and capricious manner by failing to consider whether the Third Amendment is consistent with the fiduciary duties it owes as the Companies' dominant shareholder to holders of the Companies' Private Sector Preferred Stock.

79.     Under Delaware law, which governs shareholders' relationship with Fannie Mae, and Virginia law, which governs shareholders' relationship with Freddie Mac, a corporation's dominant shareholders owe fiduciary duties to minority shareholders.

80.     The Treasury is the dominant shareholder and de facto controlling entity of the Companies: the Treasury is the Companies' only viable source of capital, and it must give its permission before the Companies issue debt or equity senior to the Government Preferred Stock.

81.     The Third Amendment expropriates the value from holders of the Private Sector Preferred Stock for the sole benefit of the Companies' dominant shareholder. In fact, the Treasury admits that the Third Amendment's purpose is to wind down the Companies' operations. The Treasury's actions in preventing any dividends or value from reaching holders of Private Sector Preferred Stock, combined with the Treasury's intent to liquidate the Companies, substantially diminishes the value of the Private Sector Preferred Stock.

82.     The Treasury's conduct in entering into the Third Amendment was arbitrary and capricious, and Plaintiff is therefore entitled to relief under 5 U.S.C. §§702, 706(2)(A).

## COUNT IV
### Violation of the Administrative Procedure Act:
### The FHFA's Conduct Exceeds Its Statutory Authority
### Under The Housing and Economic Recovery Act

83.     Plaintiff incorporates by reference the allegations of the preceding paragraphs.

84.     The APA empowers the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations" or that are "without observance of procedure required by law." 5 U.S.C. §706(2)(C), (D).

85.     The FHFA's authority as the Companies' conservator is strictly limited by HERA. When acting as a conservator, HERA requires the FHFA to take steps to put the Companies in "a

sound and solvent condition" and to work to "conserve [their] assets and property." 12 U.S.C. §4617(b)(2)(D).

86.     The FHFA, as the Companies' conservator, is without authority to wind up the Companies' operations. FHFA may only undertake such actions in its capacity as the Companies' receiver, but the FHFA has declined to put the Companies into receivership.

87.     As the Treasury has acknowledged, the Third Amendment is designed to wind down the Companies' operations. The Third Amendment intentionally impairs the Companies' ability to operate as going concerns, preventing them from ever rebuilding capital, achieving financial health, or returning to private ownership. In fact, the Third Amendment requires the Companies to accelerate the dissolution of their holdings.

88.     The dissolution of the Companies is in direct contravention of HERA's statutory command that the FHFA "conserve [their] property and assets" and undertake those actions necessary to place the Companies in "a sound and solvent condition." 12 U.S.C. §4617(b)(2)(D).

89.     Further, under HERA, even when acting as a receiver, the FHFA must wind down the Companies in accordance with specific claims-determination procedures. Among other things, HERA requires the FHFA to "promptly publish a notice to the creditors of the regulated entity to present their claims," provide creditors with no fewer than ninety days in which to file a claim, and "establish such alternative dispute resolution processes as may be appropriate for the resolution of claims." 12 U.S.C. §4617(b)(3)(B)(i), (b)(7)(A).

90.     The FHFA's decision, as a conservator, to transfer all of the Companies' net worth to the Treasury is an end-run around the procedural requirements HERA imposes on the FHFA. The Third Amendment allows the Treasury to be paid amounts that exceed the value of its claims against the Companies, while making it impossible to satisfy claims of holders of the

Companies' Private Sector Preferred Stock. In short, the Third Amendment effectively nullifies the claims of holders of the Companies' Private Sector Preferred Stock and precludes such holders from availing themselves of statutory protections to contest that nullification.

91.     The FHFA's conduct in entering into the Third Amendment was therefore "in excess of statutory . . . authority" and "without observance of procedure required by law," and Plaintiff is therefore entitled to relief against the Treasury pursuant to 5 U.S.C. §§702, 706(2)(C), (D).

**COUNT V**
**Violation of the Administrative Procedure Act:**
**The FHFA's Conduct Was Arbitrary and Capricious**

92.     Plaintiff incorporates by reference the allegations of the preceding paragraphs. The APA empowers the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A). Agency action is arbitrary and capricious if it is not the product of reasoned decision-making.  This means, among other things, that an agency must provide an adequate evidentiary basis for its action, consider all important aspects of the problem before it, and rely upon consistent, logical reasoning in reaching its decision.

93.     In entering into the Third Amendment, the FHFA acted in an arbitrary and capricious manner. The FHFA failed to engage in a reasoned decision-making process; to consider important aspects of the problem it believed it faced; to provide an adequate explanation for its decision; to consider alternatives; or to offer a reasoned justification of the Third Amendment.

94.     The FHFA has not offered any legitimate justification for the Third Amendment, which it has acknowledged prohibits the Companies from building capital and which the

Treasury has further acknowledged expedites their dissolution. The FHFA has not explained how the Third Amendment is consistent with its statutory obligation to "conserve [the Companies'] assets and property" and to return the Companies to "a sound and solvent condition." 12 U.S.C. §4617(b)(2)(D). The FHFA also has not explained whether it considered alternatives to the Third Amendment that would have been both consistent with its statutory obligations and less harmful to holders of the Companies' Private Sector Preferred Stock, including refinancing the Government Preferred Stock or allowing the Companies to resume paying dividends to holders of their Private Sector Stock.

95.     Moreover, the Private Sector Preferred Stock, such as that held by Plaintiff, was issued under a regime that gave its holders the opportunity to receive a stream of dividend payments and certain protections in the event of liquidation. The Third Amendment, however, creates an entirely new regime that deprives holders of the Private Sector Preferred Stock of any ability to realize the benefits of their bargains, no matter how well the Companies perform in the market or under what conditions they may eventually liquidate.

96.     The FHFA had an obligation to consider whether the Third Amendment was consistent with the duties it owes to holders of the Companies' Private Sector Preferred Stock. The FHFA failed to do so. The FHFA therefore failed to consider an important aspect of the issue addressed by its action, rendering the Third Amendment arbitrary and capricious.

97.     The FHFA's conduct in entering into the Third Amendment was arbitrary and capricious, and Plaintiff is therefore entitled to relief under 5 U.S.C. §§702, 706(2)(C).

## PRAYER FOR RELIEF

98.     WHEREFORE, Plaintiff prays for an order and judgment:

A.      Determining that this action is a proper class action and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.      Finding that Defendants have taken and/or illegally exacted the private property of Plaintiff and the Class in violation of the Due Process and Takings Clauses of the United States Constitution;

C.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

E.      Declaring that the Third Amendment, and its adoption, are not in accordance with HERA within the meaning of 5 U.S.C. §706(2)(C); and that the Treasury and the FHFA acted arbitrarily and capriciously within the meaning of 5 U.S.C. §706(2)(A) by executing the Third Amendment;

F.      Vacating and setting aside the Third Amendment, including its provisions that sweep the full amount of the Companies' net worth to the Treasury, that prevent redemption of the Government Preferred Stock, and that accelerate the Companies' dissolution;

G.      Enjoining the Treasury and its officers, employees, and agents from implementing, applying, or taking any action whatsoever pursuant to the Third Amendment;

H.      Enjoining the FHFA and its officers, employees, and agents from implementing, applying, or taking any action whatsoever pursuant to the Third Amendment;

I.      Awarding Plaintiff reasonable costs, including attorneys' fees, incurred in bringing this action; and

J.      Granting such other and further relief as this Court deems just and proper.


DATED:  July 16, 2013                    **FINKELSTEIN THOMPSON LLP**

                                         MICHAEL G. MCLELLAN (Bar # 489217)
                                         L. KENDALL SATTERFIELD (Bar # 393953)
                                         ELIZABETH R. MAKRIS (Bar #  996760)
                                         James Place
                                         1077 30th Street, N.W.; Suite #150
                                         Washington, DC 20007
                                         Telephone: (202) 337-8000
                                         Facsimile: (202) 337-8090
                                         mmclellan@finkelsteinthompson.com
                                         ksatterfield@finkelsteinthompson.com
                                         emakris@finkelsteinthompson.com

                                         **GLANCY BINKOW & GOLDBERG LLP**
                                         LIONEL Z. GLANCY
                                         MICHAEL M. GOLDBERG
                                         EX KANO S. SAMS II
                                         1925 Century Park East, Suite 2100
                                         Los Angeles, California 90067
                                         Telephone: (310) 201-9150
                                         Facsimile: (310) 201-9160
                                         lglancy@glancylaw.com
                                         mgoldberg@glancylaw.com
                                         esams@glancylaw.com

                                         *Counsel for Plaintiff*